CENTURY DISPLAY MANUFACTURING CORP. *et al.*, Plaintiffs, *v.* D. R. WAGER CONSTRUCTION CO., INC., *et al.*, Defendants.—(UNITED STATES STEEL CORPORATION, Defendant-Appellee.)

First District (5th Division)   No. 62966

Opinion filed February 25, 1977.

Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (James T. Ferrini and Armand E. Capanna, of counsel), for appellants.

Jerome N. Groark and James G. McConnell, both of Chicago (Rooks, Pitts, Fullagar and Poust, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This action was brought to recover damages for fire losses to plaintiffs' property allegedly caused by the negligence and wilful and wanton misconduct of defendant United States Steel Corporation (USSC). Plaintiffs appeal from the grant of summary judgment to defendant.

Plaintiffs' amended complaint contained three counts. Count I was

directed against D. R. Wager Construction Co. (Wager), a contractor not a party to this appeal, who was retained by plaintiffs to do remodeling work on the building in question. Count II alleged that USSC sold the subject building to plaintiffs, together with its fixtures—which included metal pipes, tanks and containers; that USSC knew or should have known highly flammable liquids were contained therein; that USSC breached a duty to warn plaintiffs of the presence and dangerous nature of the liquids; that the liquids ignited, and the building was damaged by fire as a direct and proximate result of the failure of USSC to warn plaintiffs of the liquids and/or its failure to remove them. Count III realleged the allegations of Count II as wilful and wanton misconduct on the part of USSC.

USSC's first amended answer denied plaintiffs' allegations, except that it admitted the sale of the premises and it asserted that a clause in the contract of sale released it from all claims arising because of the condition of the premises. In addition, it alleged that plaintiffs had a reasonable opportunity between the date it took possession (May 14, 1970) and the occurrence of the fire (August 5, 1970) to discover the existence of the liquids and to take appropriate precautions. Plaintiffs' reply denied those latter allegations.

In response to an interrogatory propounded by Wager, plaintiffs stated that they did not know of the presence of the liquid prior to August 4, 1970; that they did not warn Wager regarding the liquid; and that they did not know how much liquid had been on the premises. The reply of plaintiff Century Display Manufacturing Corporation (Century) to USSC's interrogatory stated that an agreement to purchase the premises from USSC was entered on April 28, 1970, and Century went into possession on May 14, 1970; that between September 1, 1969, and April 28, 1970, several of its executives on various occasions inspected the premises with a view toward determining their usefulness; that prior to April 28, 1970, it believed USSC used the premises for manufacturing; and that between April 28, 1970, and August 5, 1970, it used a portion of the premises for storage while repairing and remodeling were underway. In response to USSC's interrogatory, plaintiff Reliance Insurance Company (Reliance) stated that an inspection had been made by or on its behalf prior to the issuance of insurance on the premises; however, any records or reports which may have been made had been lost, misplaced, or destroyed.

In response to plaintiffs' interrogatories, USSC answered that prior to January 1, 1967, the premises known as USSC Chemical Division had been used for the manufacture of a variety of organic coatings products, consisting primarily of pigment-filled asphalt based solutions and various nonasphaltic coatings; that during 1967 and part of 1968 said products had

been stored therein, and no use of the premises by USSC was made thereafter; that the last known use of the six gauging tanks located in the subject building had been for the measuring of asphalt cut-back or solvents; that the contents of these tanks while they were in use had included asphalt cut-back, mineral spirits, kerosene, and naphtha, which are basically aliphatic solvents; that similar products had been in the mixers and blending tanks; that no records are available concerning substances which may have been left in containers, tanks, pipes, equipment or component parts after the termination of operations on January 1, 1967; that a USSC employee, J. Louis Gurecka, had informed Century executives, Hugh Best and J. T. Weiss, on July 23, 1969, that the previous use of the premises was to mix asphaltic materials; that this conversation was had in connection with an inspection of the premises during which spillage of materials was noted and all persons looked into some of the tanks and noted that materials appeared to be in the tanks; that all liquids had been removed pursuant to its order, but that its records did not reflect the dates on which this was done; and that it had no knowledge to indicate that any of its employees had notified plaintiffs concerning the existence of asphalt cut-back, mineral spirits, kerosene, or naphtha in any of the pipes, tanks, equipment, or containers in the subject building.

USSC moved for summary judgment on the grounds that prior to the fire it had conveyed the premises to plaintiffs on an "as is" basis; that plaintiffs had exclusive possession and control of the premises from May 14, 1970, to August 5, 1970; that plaintiffs had released USSC from all claims arising from the condition of the premises; and that plaintiffs had the right to inspect the premises and, in fact, did inspect the buildings and their contents on numerous occasions. In support of its motion, USSC attached a letter from J. T. Weiss, president of Century, offering to purchase the buildings and their contents "as is" for a reduced cash price, the contract of sale, the deed, and affidavits from USSC employees stating that manufacturing had ceased in 1967 and that Century executives had visually inspected the entire premises, including the buildings and fixtures located therein.

Plaintiffs, in answer to the motion for summary judgment, asserted that USSC had a duty to warn them of the existence of a dangerous condition regarding which they had no knowledge; that the use of an "as is" provision does not exculpate a vendor from the result of his own negligence; that the release provision in the contract of sale was vague, ambiguous, and indefinite and therefore unenforceable; and that factual issues existed regarding the purchase of the property, the inspection of the property, and the lack of disclosure of the presence of flammable liquids. Attached to the answer were the affidavits of Hugh Best and J. T.

Weiss, Century executives, which stated they neither received notice nor possessed independent knowledge of the existence of dangerous and explosive flammable liquids in the pipes located in the damaged building.

In a discovery deposition, Joseph T. Weiss, president of Century, testified that he took no scientific courses in college and was not associated with any organization which made, sold, or distributed asphaltic products and, in fact, had no idea as to the process or chemicals involved in making asphalt. Prior to closing, he had inspected the premises three to four times and a half dozen additional times between the dates of closing and the occurrence of the fire. During the course of these inspections, he visited all of the buildings and, in so doing, noticed tanks, mixers and many other things which were foreign to him, but he took no steps to determine if any substances were contained within the pipes and tanks. He stated that no representation had been made to him or in his presence as to whether or not anything was contained in the pipes and tanks, and that he never discussed with any USSC employees or representatives the proposed demolition of portions of the premises. Weiss knew that USSC had used chemicals on the premises, but this knowledge did not bother him since his only interest was in clearing out the buildings to create usable space. The sale was consummated on an "as is" basis, meaning that Century took the premises as it then existed—with all equipment, all materials, all chattels; *i.e.*, everything there and in the condition it was in. Shortly after the closing, he assigned an employee to determine whether any of the chemical equipment could be sold to equipment dealers or users and also contracted with Wager to demolish portions of the subject building. He assumed that Wager had inspected the premises prior to tendering a proposal, but his negotiations with Wager had never included a discussion of what, if anything, was in the pipes or tanks, as his only concern with Wager was the cost of clearing the chemical machinery. Weiss also stated that he had no knowledge of the presence of explosive chemicals and that it was the business of another corporation which he served as president to buy and liquidate companies.

In his discovery deposition, Hugh W. Best, vice president of Division Lead, a division of Century, testified that he had an accounting background but was never associated with a company which made asphaltic products. He said that he had also inspected the premises on three occasions prior to the closing and two to three times per week thereafter. He had been told that the premises had been used in the manufacture of asphalt. In fact, sometime between the dates of closing and the occurrence of the fire, he had been informed that "asphalt or something" had been pumped through the overhead material supply pipes. However, he was never informed one way or the other as to the presence of flammable liquids and never discussed with anyone in or

outside of this company what may have been in the pipes. He stated that he had no reason to tell USSC that Century was going to engage in the demolition of portions of the premises. After the date of closing, an employee of Century had inspected the machinery and equipment to determine its salability and, prior to the fire, had sold some of it. Best had been the Century representative who had negotiated with Wager concerning the demolition and remodeling of the premises but could not remember whether, in the course of an inspection tour of the premises with Wager, the pipes and/or their contents had been discussed. In addition, he said that he did not know what had caused the fire.

Defendant's motion for summary judgment was granted. Plaintiffs appeal this judgment.

## Opinion

■■ Plaintiffs first contend that genuine questions of fact exist concerning defendant's negligent conduct and that the trial court erred in finding to the contrary. Summary judgment proceedings ascertain whether a genuine issue as to any material fact exists and, should such an issue be uncovered, the motion should not be granted. (*Powell v. R. J. Anderson, Inc.* (1970), 124 Ill. App. 2d 1, 260 N.E.2d 103.) The propriety of granting the motion is determined from a study of the pleadings, answers to interrogatories, depositions, and affidavits which are on filed. (Ill. Rev. Stat. 1975, ch. 110, par. 57.) Affidavits in support of a motion for summary judgment should be strictly construed and must leave no question as to the movant's right to judgment; whereas, the opposing party's counteraffidavits should receive a liberal construction. (*American National Bank & Trust Co. v. Lembessis* (1969), 116 Ill. App. 2d 5, 10, 253 N.E.2d 126, 128.) The purpose of the proceeding is not to try an issue of fact and, although inferences may be drawn from undisputed facts, the motion should be granted only where reasonable men could not draw divergent inferences from those undisputed facts. *Doran v. Pullman Standard Car Manufacturing Co.*, 45 Ill. App. 3d 981, 360 N.E.2d 440; *McVey v. Discher* (1970), 122 Ill. App. 2d 408, 259 N.E.2d 300.

In the case at bar, it cannot be disputed that defendant made no representations and apparently plaintiffs did not know whether or not any substances remained in the pipes or tanks. Clearly, during the extensive inspections and negotiations undertaken by the parties, plaintiffs did not ask for nor did defendant volunteer any information regarding the contents of the pipes and tanks. Thus, the questions in dispute here are (1) whether plaintiffs, in view of their offer to purchase the premises "as is," their knowledge of the former use of the premises, their numerous inspection tours of the structures—including their fixtures and contents, their observation of spillages from the tanks, the plans to demolish

portions of the structures, inspection and sale of some of the chemical equipment, and their 2½-month possession and control of the premises, should have known of the contents of the pipes and tanks; and (2) whether defendant should have volunteered such information. We will consider only the second question, as we believe its answer is dispositive of the negligence count.

In this regard, plaintiffs contend that defendant had a duty to warn them of the defective condition of the premises and, having failed to do so, it became liable for the resulting property damage. A cause of action sounding in negligence must show a duty owed by defendant to exercise ordinary care for the protection of plaintiff from unreasonable risks and a breach, by act or omission, of this duty which proximately causes a resulting compensable injury. (*Fugate v. Sears, Roebuck & Co.* (1973), 12 Ill. App. 3d 656, 299 N.E.2d 108.) Plaintiffs, citing *Sparling v. Peabody Coal Co.* (1974), 59 Ill. 2d 491, 322 N.E.2d 5, as support, contend that under the facts and circumstances of this case, sections 352 and 353 of the Restatement (Second) of Torts establish that defendant owed plaintiff the duty of disclosure. Originally, by way of its reply memorandum filed in support of the motion for summary judgment, defendant questioned the applicability of sections 352 and 353 to suits involving property damage. Additionally, defendant's memorandum questioned any violation coming within the provisions of those sections, assuming their applicability to cases of property damage. In its brief in this court, defendant argued only the latter theory.

■■ Ordinarily, an issue or theory neither advanced nor argued by a party in his brief, is deemed to have been waived. (*People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied*, 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786; Ill. Rev. Stat. 1975, ch. 110A, par. 341(e)(7).) This rule does not, however, deprive the appellate court of jurisdiction to consider and determine an issue which had not been included in the appellee's brief. (*People v. Montgomery* (1974), 18 Ill. App. 3d 828, 310 N.E.2d 760.) In *Hux v. Raben* (1967), 38 Ill. 2d 223, 225, 230 N.E.2d 831, 832, it was stated:

> "* * * [T]he responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of waiver that stem from the adversary character of our system."

This practice, however, is limited to questions or theories which do not involve problems of proof and can be decided as a matter of law. (*Hux v. Raben.*) The determination of whether sections 352 and 353 apply to property damage cases is a matter of law and, because it is a novel question in Illinois, we will consider it.

The Restatement provides:

"§ 352. Dangerous Conditions Existing at Time Vendor Transfers Possession

Except as stated in § 353, a vendor of land is not subject to liability for *physical harm caused to his vendee or others while upon the land* after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession.

§ 353. Undisclosed Dangerous Conditions Known to Vendor

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, *which involves unreasonable risk to persons* on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee had taken possession, if

    (a) the vendee does not know or have reason to know of the condition or the risk involved, and

    (b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions." (Emphasis added.) (Restatement (Second) of Torts §§ 352, 353 (1965).)

Initially, it should be noted that these provisions, by their own terms, apply to conditions which cause "physical harm" to the vendee or other persons upon the land rather than damage to the land or to improvements located thereon. Secondly, the Illinois decisions which plaintiffs say have applied sections 352 and 353, have all dealt with cases of personal injury (*Sparling; Anderson v. Cosmopolitan National Bank* (1973), 54 Ill. 2d 504, 301 N.E.2d 296; *Firestone v. R. H. Lincoln, Inc.* (1974), 23 Ill. App. 3d 320, 319 N.E.2d 60), and we have found no Illinois case which has predicated liability for property damage upon these sections.

Decisions of other jurisdictions have, in certain circumstances, distinguishable from the instant case, rendered defendants liable for property damage pursuant to the authority of sections 352 and 353. (*Village Development Co. v. Filice* (Nev. 1974), 526 P.2d 83; *Rothberg v. Olenik* (1970), 128 Vt. 295, 262 A.2d 461; *Fisher v. Simon* (1961), 15 Wis. 2d 207, 112 N.W.2d 705.) In these cases, a developer who sold a lot in a subdivision for the purpose of building a new residence, and

builder/vendors who sold residences which they had newly constructed, were held liable for property damage caused by defective conditions of the land and structures on the alternate theories of (1) negligent construction; (2) implied warranties of reasonable workmanship and of suitability for human habitation; and (3) concealment or nondisclosure of latent defects which involved an unreasonable risk to persons on the land, in violation of section 353.

■■ Illinois has imposed liability upon vendors for property damage occurring after the transfer of title and possession of real property upon a theory of implied warranty of habitability. (*Garcia v. Hynes & Howes Real Estate, Inc.* (1975), 29 Ill. App. 3d 479, 331 N.E.2d 634; *Hanavan v. Dye* (1972), 4 Ill. App. 3d 576, 281 N.E.2d 398; *Weck v. A:M Sunrise Construction Co.* (1962), 36 Ill. App. 2d 383, 184 N.E.2d 728.) However, this rule has been limited to contractor-builders who sell directly to lay purchasers. (*Garcia.*) Thus, in affording protection to vendees by the use of an implied warranty, Illinois has drawn a sharp distinction between a contractor-builder who sells to a lay purchaser and other vendors who sell older structures, particularly when the sale is to a business entity. Such a distinction is also found in those cases where builder/vendor liability has been predicated upon sections 352 and 353. As stated in *Rogers v. Scyphers* (1968), 251 S.C. 128, 132, 161 S.E.2d 81, 83:

> "While most courts still adhere to the proposition that in the usual, normal sale of lands, and old buildings, the ancient doctrine of caveat emptor applies, with respect to a vendor, who is also the builder of a new structure, the decided trend of modern decisions is to make a distinction. Where the vendor *is* also the builder he *is* today, by the weight of modern authority, held liable for damages and injuries occurring after the surrender of title and possession * * *."

We find this distinction to be a valid one and, as Illinois law does not require the general application of sections 352 and 353 to cases of property damage, it appears to be the better rule to withhold their application from property damage suits involving an arms-length sale of an old structure.

■■ Here, there was a sale of an old structure by one business entity to another, after extensive negotiation and inspection. Century executives inspected all of the buildings, including their contents, on several occasions both prior to and subsequent to the transfer of possession and control. Its attorneys had taken part in negotiating the contract of sale which, at Century's suggestion, was consummated on an "as is" basis for a reduced price. Weiss, Century's president, defined "as is" to mean that it took the premises as they then existed—including all the equipment, materials, and chattels; *i.e.*, everything which was there and in its then

condition. Immediately after closing, he set about liquidating the chemical equipment and remodeling the structures to suit Century's purposes. In this endeavor, Weiss cannot be viewed as a layman, in the light of his experience in purchasing and liquidating companies—which was the business of another corporation of which he was president. Clearly, this was an arms-length transaction and, furthermore, we believe that the facts here do not present the type of unreasonable risk to persons upon the premises, as set forth in section 353 of the Restatement. The complaint alleged that the liquids left in the pipe and/or tanks proximately caused the fire and/or damage. However, there is no indication how the liquids presented an unreasonable risk, so long as they remained in the pipes and tanks. The complaint, together with the affidavits and depositions of Best and Weiss, described the liquids as explosive and/or highly flammable, but on several occasions they also stated they knew nothing of the chemical properties. Defendants' interrogatories disclosed the chemical features of the liquids but shed no light on the question of whether they presented an unreasonable risk to persons. Without any indication of the conditions under which the liquids would ignite, it cannot be reasonably said that the mere presence of flammable liquids in a closed system is an unreasonable risk to persons on the premises, either in terms of physical injury or of health or safety hazards. See *Van Skike v. Zussman* (1974), 22 Ill. App. 3d 1039, 318 N.E.2d 244.

As the facts and circumstances of the instant case do not comport with the criteria upon which a distinction was carved out for developers and/or builders who sell new homes to lay purchasers and because they have wholly failed to raise the question of an undisclosed condition in an old structure which was unreasonably dangerous to persons on the land, we think that sections 352 and 353 cannot furnish a basis upon which to predicate a duty of disclosure. Having no duty to disclose the presence of the liquid in the pipes and/or tanks, we find, as a matter of law, that defendant has established the right to judgment in its favor, and we conclude that the trial court properly granted his motion for summary judgment.

As a consequence of our determination, we need not consider the issue of whether the language in the contract of sale exculpated defendant from the consequences of its negligence.

■■ Plaintiffs also assert the trial court erred in granting summary judgment in favor of defendant on Count III, which charged wilful and wanton misconduct. We agree. Defendant argues that, in Count III, plaintiffs merely reiterated the allegations of negligence in Count II and substituted the words both "wilful" and "wanton" for "negligence." Otherwise, he maintains that the allegations of the two counts are

identical, and he refers us to *Ingram v. New York Central R.R. Co.* (1961), 30 Ill. App. 2d 455, 175 N.E.2d 129, which hold that where the allegations of a complaint amount to no more than a charge of negligence, the addition of the words "wilful" and "wanton" did not make it sufficient. Further, they argue that the trial court properly found there was no genuine issue of material fact as to the alleged allegations of wilful and wanton conduct, because plaintiffs presented no evidence in their motion for summary judgment or supporting documents of any fact tending to prove wilful and wanton conduct. While we agree with the general proposition of law expressed in *Ingram*, we note that defendant failed to raise this issue in the trial court. Its motion for summary judgment was phrased as if it were directed to one count, and a fair reading of it indicates that the count upon which summary judgment was sought is that sounding in negligence—which was Count II. Only as a matter of sheer speculation could it be said that plaintiffs would not have included additional facts in the counteraffidavits had they been put on notice that defendant also sought judgment on Count III. Therefore, for purposes of this appeal, defendant will not be heard to complain of an insufficient factual basis in support of the charge of wilful and wanton misconduct. A defendant must test the legal sufficiency of a complaint by a motion to dismiss or to strike, and not by a motion for summary judgment, which should be filed only after a legally sufficient cause of action has been stated. (*Janes v. First Federal Savings & Loan Association* (1974), 57 Ill. 2d 398, 312 N.E.2d 605.) Accordingly, defendant cannot avoid the effect of the deficiency of its motion for summary judgment as to the wilful and wanton count by raising the sufficiency of the complaint for the first time on appeal. (*Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 343 N.E.2d 589.) Moreover, the sale contract clause which purports to release defendant from any claim arising from a condition of the premises, is unavailing to defeat a charge of wilful and wanton misconduct. (*Schek v. Chicago Transit Authority* (1969), 42 Ill. 2d 362, 363-64, 247 N.E.2d 886; *Third Swansea Properties, Inc. v. Ockerlund Construction Co.* (1976), 41 Ill. App. 3d 894, 354 N.E.2d 148.) As defendant failed to properly establish its right to summary judgment as to the wilful and wanton charge, the trial court erred by granting summary judgment in its favor as to Count III.

For the foregoing reasons, the judgment of the circuit court is affirmed as to Count II but reversed and remanded for proceedings not inconsistent with the views expressed in this opinion as to Count III.

Affirmed in part.

Reversed and remanded in part.

LORENZ and MEJDA, JJ., concur.