MITCHELL WARE, Plaintiff-Appellant, *v.* C. BERNARD CAREY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 78-540

Opinion filed August 27, 1979.

Adam Bourgeois, of Chicago (Donald Hubert, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Barry Gross and Henry A. Hauser, Assistant State's Attorneys, of counsel), for appellees.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

In 1973 plaintiff, Mitchell Ware, filed a complaint against C. Bernard Carey, Ralph Berkowitz, Kenneth Gillis and Nicholas Iavarone, charging defamation. After several amendments and the dismissal of various counts, plaintiff's third amended complaint was reduced to three counts

(counts I, III and X). Defendants filed their motion for summary judgment on all three counts and subsequently amended that motion. Plaintiff moved for summary judgment as to counts I and III. On January 19, 1978, the circuit court of Cook County granted summary judgment for defendants on all counts. Plaintiff appeals that order. Because of the death of defendant Berkowitz, the action has abated as to him.

At the time of the alleged defamatory publications, plaintiff was the deputy superintendent of the Chicago Police Department. His responsibilities included supervision of the intelligence division, internal affairs division, inspections division and vice control division. Defendant, C. Bernard Carey, was the Cook County State's Attorney. The remaining defendants were assistant State's attorneys.

Count I alleges that Carey defamed plaintiff by virtue of a press release and public statement issued on September 11, 1973. It was further alleged that Carey knowingly made these false, defamatory statements. Count III alleges that Carey defamed Ware when he knowingly made false defamatory statements on a television interview show. Count X alleges that Carey and the other defendants caused the Cook County grand jury to issue a letter to Chicago police superintendent James Rochford that defamed plaintiff. Ware also alleged that defendants acted with knowledge of the falsity of the letter's contents. The circuit court entered summary judgment for defendants on counts I and III, finding as a matter of law that actual malice did not exist. Summary judgment for defendants on count X was also granted because there was no genuine issue of material fact that defendants caused the drafting or publication of the letter.

Ware appeals on all counts, contending that factual issues remain necessitating remandment for trial on the merits. We affirm on all counts. Further development of the facts pertaining to each count follows in connection with the contentions of the parties.

I.

Count I concerns Carey's September 11, 1973, press release, which follows in its entirety:

"I have called this press conference to call public attention to what appears to me a deliberate attempt by Mayor Daley and his Police Superintendent Conlisk and Mitchell Ware to cover up police corruption and downgrade the efforts being made by this Office and U.S. Attorney James Thompson to expose and prosecute the many instances of extortion, shakedown, and corruption in the Police Department.

Yesterday, a story appeared in one of the Chicago newspapers in which Mitchell Ware, Deputy Superintendent of Police in charge

of inspectional services stated that now the cleanup of the Police Department in Chicago has been completed. According to Ware there can be no more corruption in the Police Department because if there was he would be aware of it.

This follows the recent statement by Ware's mentor, Mayor Daley, that there is no corruption in the Police Department. The public is corrupt, not the police.

Shortly before the Mayor's astounding pronouncement his Police Superintendent James Conlisk exploded to the press his confidence in the Police Department and in fact characterized prosecution of police extortionists as a smear on the top command of his Department. These public statements seem to me to be a deliberate signal to the police that official Chicago will continue to wink at corruption.

I want to go on record that nothing is further from the truth. The era of police shakedown and extortion is ending. Such practices will no longer be tolerated.

My office and the U.S. Attorney's office will continue to investigate and prosecute any illegal acts to the limit of the law. It is the height of irony that the C-5 unit which Ware credits with the miracle of completing the cleanup of police corruption in Chicago should be headed by Mayor Daley's protege, John J. Clarke, the man who is himself under indictment in the Federal Court on 8 counts of obstruction of justice and perjury. This is one more glaring example of Mayor Daley's contempt for the intelligence of the people of Chicago and their concern for a Police Department worthy to meet the challenge of crime.

Conlisk has publicly declared his confidence in Clarke despite the federal indictment. He can see nothing wrong in keeping a man in charge of this sensitive C-5 unit whose integrity has been challenged by the Federal Grand Jury. On the other hand, he cannot contain his indignation that at long last corruption within the Department is being brought to account before the courts.

This City's Police Department faces a crisis of confidence with the public. This is not a time for officials to show weakness or avert their eyes. I call upon these officials to retract these obnoxious statements and join with me to root out police corruption.

Our office has charged or convicted 19 police officers this year, while the U.S. Attorney's Office has 61 indictments or convictions of police officers.

The vast majority of police are honest. They strive to be allowed to carry out their duty to protect the safety of the community. Without public respect and cooperation, their job can become

difficult and bitter. To ignore and even condone police corruption puts an extra burden on the honest cop.

Mitchell Ware was appointed to clean up the Police Department when the public was crying out against obvious dishonesty, but now that the heat has cooled down, Daley, Conlisk and Ware think they can go back to the old routine of automatic whitewash.

U.S. Attorney Thompson and I are determined to rid the Police Department of the extortionists and shakedown artists of whatever rank. Chicago needs and is entitled to an honest Police Department."

Ware alleged that these statements were reported extensively by various Chicago newspapers, wire services and local radio and television stations. He contends that according to the plain meaning of the statement, Carey accused him of protecting and covering up police corruption.

After learning about this press release, Ware made a phone call to Carey. Ware alleged in his complaint that during this phone conversation "[t]he defendant Carey acknowledged and admitted the falsity of the statements complained of * * *."

Ware asserts that summary judgment on count I was improper because the depositions on file established a material issue of fact as to whether Carey published his statements with actual malice (*i.e.*, with knowledge of the falsity of his remarks or reckless disregard of whether they were false or not). *Troman v. Wood* (1975), 62 Ill. 2d 184, 189-190, 340 N.E.2d 292.

Carey offers four responses. First, by filing a cross-motion for summary judgment on count I, Ware conceded that no triable fact issues remained and waiver or estoppel prohibits his arguing this issue on appeal. Second, his press release is capable of an innocent construction. Third, no triable issue as to actual malice exists. Fourth, as Cook County State's Attorney, Carey is protected by an absolute privilege from defamation actions.

■■ We find that Carey was protected by an absolute privilege from civil defamation and need not address the remaining issues.

## II.

Carey maintains that the public statement which forms the basis for count I is protected by the absolute executive privilege recognized in *Blair v. Walker* (1976), 64 Ill. 2d 1, 349 N.E.2d 385. Alternatively, he. claims the statement is nonactionable because of the doctrine of prosecutorial (quasijudicial) immunity as defined in *Imbler v. Pachtman* (1976), 424 U.S. 409, 47 L. Ed. 2d 128, 96 S. Ct. 984. We agree that *Blair* is controlling and need not discuss quasijudicial immunity.

In *Blair*, plaintiffs were allegedly libeled by press releases made by

Governor Walker. The Governor stated that plaintiffs used a corporate front and legal technicalities to obtain the home of a "helpless woman" through a foreclosure sale. He accused plaintiffs of violating real estate broker licensing laws and characterized them as "unscrupulous." The Governor further stated that he had instructed the Department of Registration and Education to revoke plaintiffs' real estate licenses.

The supreme court held that the Governor is protected from defamation actions by an absolute privilege when issuing statements legitimately related to matters committed to his responsibility. Plaintiffs contended that since the Governor had no express authority to license real estate brokers, he had acted beyond the scope of his duty. The court reasoned that the Governor did not violate the inherent, discretionary authority of his office by informing the public of actions he had directed be instituted against plaintiffs. The Governor's duties include supervision of the Department of Registration and Education. Department officers are his subordinates. If the Governor's statements had been communicated to Department officials, they clearly would have been absolutely privileged. The court also believed that the Governor did not exceed the bounds of his duty in communicating this message to his constituency.

Carey asks us to extend the *Blair* holding to afford him an absolute privilege in this case. Two issues concern us: (1) whether absolute executive immunity granted the Governor in *Blair* should be applied to the State's Attorney, and (2) if so, whether Carey acted within the scope of that immunity.

We note initially that the State's Attorney is an executive official as his office is part of the executive branch of government. (*People v. Vaughn* (1977), 49 Ill. App. 3d 37, 363 N.E.2d 879.) *Blair's* grant of absolute executive immunity was held applicable to the chief executive officer of a municipality in *Loniello v. Fitzgerald* (1976), 42 Ill. App. 3d 900, 356 N.E.2d 842. Statements made by a mayor during a city council meeting were within the ambit of this privilege. The *Loniello* court deemed it logical that a mayor, like the Governor, "should be able to carry out his daily responsibilities free from concern that his actions will result in civil damage suits." *Blair*, 64 Ill. 2d 1, 7; see also *Larson v. Doner* (1961), 32 Ill. App. 2d 471, 178 N.E.2d 399 (absolute privilege afforded mayor and city commissioners).

We are of the opinion that the policy underlying the grant of absolute immunity in *Blair, Loniello* and *Larson* is equally applicable to the instant case. Judge Learned Hand summarized the policy considerations favoring absolute immunity for government officials in *Gregoire v. Biddle* (2d Cir. 1949), 177 F.2d 579, 581, *cert. denied* (1950), 339 U.S. 949, 94 L. Ed. 1363, 70 S. Ct. 803:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to satisfy a jury of his good faith."

■■ Carey is the chief law enforcement official for Cook County, Illinois. The State's Attorney is a high-ranking executive officer and an officer of the court charged with the administration of the law. (*People v. Dean* (1923), 308 Ill. 74, 139 N.E. 37.) He has also been described as a "quasi-judicial" officer. (*People ex rel. Schreiner v. Courtney* (1942), 380 Ill. 171, 43 N.E.2d 982.) We believe that his office and the social and public interests it furthers are comparable to the chief executive officials of municipalities. Accordingly, we hold that the State's Attorney has an absolute executive privilege from liability for defamation arising from the performance of his duties.

■■ It remains to be considered whether Carey's press release under the circumstances of this case concerns matters legitimately related to matters committed to his responsibility. (*Blair.*) Duties of the State's Attorney are codified in section 5 of "An Act in regard to attorneys general and state's attorneys" (Ill. Rev. Stat. 1977, ch. 14, par. 5). Among others, they include the duties:

"(1) To commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned.

\* \* \*

(6) To attend before judges and prosecute charges of felony or misdemeanor, for which the offender is required to be recognized to appear before the circuit court, when in his power so to do.

\* \* \*

(10) To perform such other and further duties as may, from time to time, be enjoined on him by law."

The Illinois judiciary has added the duty to keep informed as to violations

of the criminal laws (*O'Hair v. People* (1889), 32 Ill. App. 277) and to investigate facts and determine whether an offense has been committed (*People v. Pohl* (1964), 47 Ill. App. 2d 232, 197 N.E.2d 759). The State's Attorney has the responsibility of evaluating evidence and other pertinent factors and determining what, if any, offense may be charged. (*People v. Rhodes* (1967), 38 Ill. 2d 389, 231 N.E.2d 400.) In short, he has wide discretion in enforcing the criminal laws. (*Marcisz v. Marcisz* (1976), 65 Ill. 2d 206, 357 N.E.2d 477.) We interpret these principles as charging the State's Attorney with responsibilities in criminal matters prior to any formal charging that may take place.

Standards of the American Bar Association regarding prosecution are also helpful in delineating the scope of the State's Attorney's responsibilities. (ABA Standards, The Prosecution Function (1971).) Sections 1.1(a), (b), and 2.7 provide:

"1.1 The function of the prosecutor.

(a) The office of prosecutor[, as the chief law enforcement official of his jurisdiction,] is an agency of the executive branch of government which is charged with the duty to see that the laws are faithfully executed and enforced in order to maintain the rule of law.

(b) The prosecutor is both an administrator of justice and an advocate; he must exercise sound discretion in the performance of his functions.

❋ ❋ ❋

2.7 Relations with the police.

(a) *The prosecutor should provide legal advice to the police concerning police functions and duties in criminal matters.*

(b) The prosecutor should cooperate with police in providing the services of his staff to aid in training police in the performance of their function in accordance with law." (Emphasis added.)

Particularly pertinent is section 3.1(a):

"A prosecutor, as the chief law enforcement official of his jurisdiction, ordinarily relies on police and other investigative agencies for investigation of alleged criminal acts, but he has an affirmative responsibility to investigate suspected illegal activity when it is not adequately dealt with by other agencies."

Of particular interest to this case are remarks in the Introduction to these ABA standards:

"[T]he prosecutor is the leader of law enforcement in the community. He is expected to participate actively in marshaling society's resources against the threat of crime. When a crisis in the enforcement of criminal law arises in the community ❋ ❋ ❋ he may be drawn into the maelstrom of political controversy by the

demand that he 'stamp out the criminals.' *He is called upon to make public statements,* to propose legislative reforms, or to direct the energies of the law enforcement machinery of the community." (Emphasis added.) ABA Standards Relating to the Administration of Criminal Justice, Compilation, at 77 (1974).

ABA Standards regarding police functions also are instructive (ABA Standards, The Urban Police Function §§1.1, 5.1, 9.3 (1973):

"1.1 Complexity of police task.

(a) Since police, as an agency of the criminal justice system, have a major responsibility for dealing with serious crime, efforts should continually be made to improve the capacity of police to discharge this responsibility effectively. It should also be recognized, however, that police effectiveness in dealing with crime is often largely dependent upon the effectiveness of other agencies both within and outside the criminal justice system. Those in the system must work together through liaison, cooperation, and constructive joint effort. This effort is vital to the effective operation of the police and the entire criminal justice system.

\* \* \*

5.1 Need for accountability.

Since a principal function of police is the safeguarding of democratic processes, if police fail to conform their conduct to the requirements of law, they subvert the democratic process and frustrate the achievement of a principal police function. It is for this reason that high priority must be given for ensuring that the police are made fully accountable to their police administrator and to the public for their actions.

\* \* \*

9.3 The news media.

Public understanding of the police function is heavily dependent upon the coverage given by mass media to the newsworthy events in which the police are involved. Newspaper, radio, and television reporters assigned to reporting on police activities should have a sufficiently thorough understanding of the complexities of the police function to enable them to cover such events (as well as other matters that now go unreported) in a manner that promotes the public's understanding of the police role."

■■ With these principles in mind, we turn to the circumstances of the instant case. Carey submitted an affidavit in support of his motion for summary judgment on counts I and III. This affidavit was not contested by motion or counteraffidavit, so its substance must be taken as true. (*Heidelberger v. Jewel Companies, Inc.* (1974), 57 Ill. 2d 87, 92-93, 312 N.E.2d 601; *Watson v. Southwest Messenger Press, Inc.* (1973), 12 Ill.

App. 3d 968, 299 N.E.2d 409.) Carey contends that his affidavit establishes an innocent construction for his press release. We do not reach this issue, but consider the affidavit solely to determine the scope of Carey's responsibilities as Cook County State's Attorney. In pertinent part, the affidavit reads:

"5. That statements which are the subject matter of Counts I and II of the Substitute Third Amended Complaint were made by me as State's Attorney of Cook County in response to statements by the late Mayor Chicago, Richard J. Daley, that the person that pays off a police official is responsible for police corruption and not the policeman that takes the money, and that tavern owners may lose their liquor licenses after they testify against the police officers charged with extorting the payoff; a statement by former Chicago Superintendent of Police James Conlisk publicly attacking the credibility of a police officer who testified in a police extortion trial that other police officers extorted or received payoffs from tavern owners; and the statement of plaintiff Mitchell Ware that all pockets of corruption have been removed from the Chicago Police Department.

6. The aforementioned statements were made during the pendency of an extortion trial of a Chicago Police Commander and other Chicago policemen before an unsequestered jury.

7. That my many years of experience as a law enforcement official and my reading of studies of official corruption led me to believe that corruption cannot be eradicated until there is an admission that it exists and that the aforementioned statements of Mayor Daley, Superintendent Conlisk and Deputy Superintendent Ware, taken together, implied that individuals who came forward to testify about police extortion and payoffs could be punished and that police officers could infer that other law enforcement officials would not be vigilant in attempting to eradicate corruption.

8. That by my statements I intended to call a halt to the type of statements being made by Mayor Daley, Superintendent Conlisk and Deputy Superintendent Ware and request that we work together to eradicate corruption.

9. That I believed that my statements, taken as a whole, were true and in the best public interest."

■■ We believe that Carey's issuance of the press release remarks were legitimately related to his responsibilities as leader of community law enforcement and his concomitant duty to investigate police corruption. The ABA Standards charge the prosecutor with (1) the duty to insure faithful execution of the laws (§1.1(a)); (2) providing legal advice and training concerning police functions (§2.7); (3) an affirmative

responsibility to investigate suspected illegal activity when this is not adequately dealt with by the police (§3.1(a)); and (4) maintaining liaison, cooperation and constructive joint effort with the police department to assure police effectiveness in dealing with crime (§1.1 of The Urban Police Function).

If that portion of the press release pertaining to Ware was communicated directly to him, rather than to the public, it undoubtedly would be absolutely privileged. Carey's affidavit demonstrates his twofold concern over (1) the effect Ware's statement may have had on a pending police extortion trial and Carey's ability to prosecute future episodes of police misconduct, and (2) the need to recognize corruption exists as a prerequisite to its eradication. The communication of these concerns to Deputy Superintendent Ware was certainly consistent with the principles set forth by the ABA. It was also a proper exercise of Carey's discretion as to the pretrial administration of criminal justice.

Following the *Blair* analysis, we must next decide whether Carey's decision to inform the general public should be afforded absolute privilege. We are of the opinion that, like the Governor in *Blair*, Carey could, in the exercise of his discretion, communicate these remarks to the public. The ABA Standards portray the importance of public disclosure concerning the police function (ABA Standards, The Urban Police Function §9.3 (1973)) and the need for police accountability to the public (§5.1). The State's Attorney has the inherent power as the chief legal official in the county to maintain this accountability. As the Introduction to the Standards indicates "[h]e is called upon to make public statements" and "the prosecutor's activity is in large part open to the public gaze * * * and spotlighted by the press." We cannot say Carey's call for public accountability by Ware was outside the perimeters of the State's Attorney's discretion.

In *Blair*, the court noted that the Governor did not exceed the scope of his discretionary powers by informing the public about disciplinary actions he had directed be taken. Indeed, the effective functioning of our system of government is dependent largely upon the force of an informed public opinion as to the quality of service rendered by public officials, and free and unfettered action by the public's representatives. (*Howlett v. Scott* (1977), 69 Ill. 2d 135, 144, 370 N.E.2d 1036.) Carey's press release appeared to be an effort to harness the dual effectiveness of his office and public opinion to curb what he believed was an improper use of police powers by Ware. Carey's remarks may be taken, therefore, as an official reprimand to Ware for actions that Carey believed were not in the best interest of criminal justice administration.

■■ Ware argues, however, that the State's Attorney's office admitted that no prosecution or investigation of Ware was under process or even

contemplated. Therefore, Carey exceeded his traditional responsibilities by accusing Ware of protecting corruption. This argument misses the point. Ware had made public statements that all pockets of corruption had been eradicated from the Chicago Police Department. Carey feared this sort of statement might have influenced an unsequestered jury in a pending Federal trial. Investigation of whether Ware had made his statements with the intent of protecting corruption was not necessary since the effect of his statements might have influenced that jury. According to his affidavit, Carey acted based upon his experience in law enforcement, his studies of official corruption, and his belief that police corruption continued to exist in Chicago. At the point in time of Carey's remarks to the press, Carey was only concerned with the veracity and effect of Ware's statement and the appearance of impropriety by Ware. The fact that no formal investigation or charging of Ware based upon an intent to protect corruption took place does not militate against Carey's responsibility to mitigate what he believed were damaging remarks by Ware. Accordingly, under the circumstances described above, Carey's September 11, 1973, press release was absolutely privileged.

We need not decide if executive absolute immunity is applicable to counts III and X, as they are affirmed for other reasons explained below.

## III.

Count III of plaintiff's complaint alleges that on September 23, 1973, Carey made the following defamatory statement during a public television appearance:

"Question from Mary Jane O'Dell: Mr. Carey, I don't understand why are you miffed with Mitchell Ware because he seems to have done something before you did it * * * you say you are going to do this * * * you are planning to do this * * * but you haven't actually done it yet. What has he done thats wrong?

Carey: No not at all. And if you will look back at what I have said regardless of how they have changed the tones of all this and all the silly counter charges that they have made * * * is that my only disagreement with Mitchell Ware is that I disagreed with two statements that he made. The first one indicating that all the police corruption had now been cleaned up and that he was aware of all the pockets of corruption * * * now this couldn't be so because he hasn't brought us all of these things that we know are still going on. Now we have worked on a cooperative basis with the C-5 Unit and they have done an excellent job in many areas * * * and I never questioned the job that they are doing. What I question are these types of public statements that are intended to delude the public

into thinking that this is all over now or utilizes a signal to everyone that now you don't have to cooperate anymore because the corruption is ended and we're going to go back to good old times in Chicago. Those were my quarrels with Mitchell Ware * * * I also quarreled with his statement the other day that this gambling operation erradicated a three million industry when in fact the next day the operation is back in business.

Question from Mary Jane O'Dell: But isn't it a fact your quarrel with him goes a little deeper than that, doesn't it Mr. Carey, because you say that the statements he makes are not really true. Well granted that it hasn't all been eradicated, but basically what you're saying is that the Mayor and Superintendent Conlisk and Mr. Ware are all responsible—are all responsible for protecting the syndicate. Thats what you're really saying.

Carey: Oh yes, lets put that back in the proper perspective. Its a historical fact that the syndicate has operated for years in the city of Chicago and I dare anyone to try and dispute that fact and its also historical fact and its not only historical fact but its a matter of testimony in pending federal trials excluding the one thats going on now which we can't discuss * * * but the federal trials that have gone on heretofore which indicated much corruption in high public officials including an ex-governor, including the present, at that time the present county clerk, and corruption within the police department, convictions have been had."

Specifically, Ware contends that Carey's response to the second question is an allegation that Ware was responsible for protecting the syndicate. Carey asserts that summary judgment in his favor on count III was proper based on three grounds. First, the complaint alleges only conclusions with regard to the alleged defamatory statement and does not allege actual malice. Second, the specific statement alleged was never pleaded until after the statute of limitations had expired. Third, the specific statement complained of is capable of an innocent construction which does not defame Ware.

We agree with Carey's third contention and need not address his other arguments. The innocent-construction rule requires that an article, passage or statement be read and construed as a whole and the words given their natural and obvious meaning. Words that are allegedly libelous, capable of being read innocently must be so read and declared nonactionable as a matter of law. *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 347, 243 N.E.2d 217; *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, *cert denied* (1962), 371 U.S. 877, 9 L. Ed. 2d 114, 83 S. Ct. 148.

We are of the opinion that placed in the full context of the

conversation Carey's response is capable of an innocent construction. Mary Jane O'Dell offered two questions for Carey's consideration. First, he was asked: "But isn't it a fact your quarrel with him goes a little deeper than that, doesn't it Mr. Carey, because you say that the statements he makes are not really true." Immediately following was the query: "Well granted that it hasn't all been eradicated, but basically what you're saying is that the Mayor and Superintendent Conlisk and Mr. Ware are all responsible—are all responsible for protecting the syndicate. Thats what you're really saying." Carey's response, "Oh yes, lets put that back in the proper perspective" might refer to either question. It is possible that Carey was merely quarreling with Ware's claim that police corruption did not exist, rather than accusing Ware of protecting corruption and the syndicate. Accordingly, we are required to hold Carey's statement is nonactionable.

The plausibility of this innocent construction is evidenced by Carey's response to O'Dell's previous question which is quoted above. There, she also presented Carey with a twofold question: "I don't understand why are you miffed with Mitchell Ware" and "What has he done thats wrong?" Carey's answer, "No not at all" more probably relates to the first question and indicates he was not "miffed" at Ware. Consistency would require his answer to O'Dell's next question also be interpreted as sequential.

## IV.

Count X of plaintiff's complaint deals with the publication of a letter, signed by the foreman of the extended May 1975 grand jury, to the superintendent of the Chicago Police Department, James M. Rochford. The substance of the letter was that evidence presented during the grand jury investigation indicated that Deputy Superintendent Ware completely ignored his responsibility to supervise the activities of the security section of the Chicago Police Department. Ware was accused of gross neglect of his official duties which contributed to the excesses engaged in by members of the security system. Ware alleged that the letter was written at the direction of the defendants Carey, Berkowitz, Iavarone and Gillis, and published in the news media by or with their approval.

The complaint further alleges that the scope of the investigation by the extended May 1975 grand jury concerned criminal acts committed by police officers from 1967 to 1970. Defendants were aware that Ware did not join the Chicago Police Department until 1972. Thus, each defendant was allegedly aware of the falsity of the letter's contents.

Defendants' motion for summary judgment was supported by the affidavits of Carey, Berkowitz, Gillis and Iavarone. Each affiant asserted that he did not cause or direct the grand jury foreman to write, sign or issue the controverted letter. Nor did affiants cause or direct their agents

or employees to take such action. Attached also to the motion for summary judgment were excerpts from the deposition of the grand jury foreman, Sylvester Maida. Pertinent portions of Maida's deposition testimony explaining the composition and publication of the letter follow:

"Q [by Mr. Ware]: Had you ever met with any of the Defendants and that would include Bernard Carey, Ralph Berkowitz, Kenneth Gillis, Nicholas Iavarone, or any of their employees before the convening of the Cook County Grand Jury?

A: No.

Q: Have you ever met and conversed with either of the Defendants in this cause outside the Grand Jury room?

A: No.

* * *

Q: When did you initially decide to write the letter?

A: I guess I did write the letter but the jury did discuss some kind of letter to Rochford, and this is what they discussed and what they wanted to send.

* * *

Q: Did you discuss the idea of writing the letter, the contents of this letter with anyone other than a Grand Juror outside the Grand Jury room before it was written?

A: No.

* * *

Q: Were you given any directions or suggestions or assistance in the composition of this letter by anyone in the State's Attorney's office outside the Grand Jury room?

A: No, not that I can recall, no.

Q: Did anyone in the State's Attorney's office suggest to you the writing of the 44 page report or the letter in this case outside the Grand Jury room?

A: No.

* * *

The Witness: I didn't write the letter. There was some college people there that were a little—in fact, towards the end of the last couple of weeks of this here, when they wrote up this recommendation, there were a couple of —well, I presume they had college educations because they were rather smart, as far as I was concerned, and they kind of took over the recommendations. And there was one or two others that were kind of—a little sharp on this and I kind of just sat in the background and just listened to what they were doing and went along and read it and agreed with them on what they had said and on what they decided, the recommendation of it.

That's why I said I never wrote any letters, or I don't think I ever made my own recommendation in that 44 page report. That was all agreed by the jurors, so this is the truth and nothing but the truth."

During their depositions, defendants were questioned as to whether they wrote the letter to Rochford or assisted the foreman in its drafting. Defendants refused to answer on the grounds of grand jury secrecy. Therefore, defendants' depositions are not inconsistent with their affidavits.

Plaintiff filed a response to defendants' motion for summary judgment as to count X. He contended that an issue of fact remained; that defendants' affidavits were self-serving and failed to resolve the issue of responsibility for the letter; and that defendants failed to answer pertinent questions on discovery under the guise of grand jury secrecy. In support of his response, Ware attached excerpts from the deposition of Maida, excerpts from the depositions of defendants Iavarone and Gillis and his own affidavit.

Ware's affidavit states that defendants were aware of when he began his services as a Chicago Police Department superintendent. Affiant further stated that each defendant knew of the existence of a gag order issued by the circuit court of Cook County pertaining to the extended May 1975 grand jury. Iavarone and Gillis were working under the direction of Carey and Berkowitz and reported to them on grand jury activities.

Ware also stated that the letter "was delivered at the direction of the defendant Iavarone, and with knowledge and complicity on the parts of both Iavarone and Gillis [with knowledge] that it contained * * * defamatory allegations concerning [Ware]." Affiant attempted to identify the individuals specifically responsible for the letter but defendants chose not to answer during discovery, alleging grand jury secrecy.

Excerpts from Maida's deposition testimony selected by Ware establish that Maida did not personally write the letter to Superintendent Rochford. In fact, Maida had little or no recollection as to the drafting, editing, typing or mailing of the letter. However, Maida did admit the possibility that the grand jury was responsible for the letter. He maintained that his involvement, if any, consisted of reading the proposed letter and signing it

Gillis' deposition revealed that he was familiar with the grand jury letter and report. However, Gillis was instructed by counsel not to answer questions pertaining to the grand jury letter. Gillis, therefore, offered no information as to the preparation of the letter and report.

The deposition testimony of Iavarone established that he was familiar with the letter sent to Rochford, that he knew its contents and

that he had it physically delivered. The witness professed to know who wrote the letter but was instructed by counsel not to answer the question: "Did you write the letter?" Iavarone stated that Carey knew about the letter but did not know its contents until this suit was filed. He did not personally show the letter to Carey or Berkowitz. Iavarone did show the letter to Gillis, but did not know if Gillis discussed it with Carey or Berkowitz. Iavarone also testified that his secretary had typed the letter.

■■ We find that, based on the above-mentioned affidavits and deposition excerpts, no triable issue of fact existed as to whether defendants were responsible for the publication of the grand jury letter.

■■ ■ Defendants' affidavits are neither controverted by Ware's affidavit nor by deposition testimony. An affidavit in support of a motion for summary judgment is actually a substitute for in-court testimony and should contain as much information as the affiant could competently testify to if he were sworn as a witness. (*Fooden v. Board of Governors of State Colleges & Universities* (1971), 48 Ill. 2d 580, 587, 272 N.E.2d 497, *cert. denied* (1972), 408 U.S. 943, 33 L. Ed. 2d 766, 92 S. Ct. 2847.) Here, defendants directly contradicted the allegations of count X in their affidavits by denying any responsibility for the drafting or publication of the grand jury letter. Where such averments of fact are not contradicted by counteraffidavit, they must be taken as true, notwithstanding the existence of contrary averments in the adverse party's pleadings which merely purport to establish issues of fact. (*Fooden.*) Ware's counteraffidavit is wholly conclusory, speculative and merely serves to restate the allegations of his complaint with reference to defendants' responsibility for the letter. Ware states no facts indicating his personal knowledge concerning these allegations. Moreover, Ware admitted in his deposition that he had no personal knowledge regarding what transpired before the grand jury. Only defendants and Maida would have personal knowledge as to responsibility for the letter. Defendants' affidavits denying responsibility remain uncontroverted by Ware. Maida's explanation that other jurors may have been responsible for the letter is consistent with defendants' affidavits. Accordingly, summary judgment for defendants as to count X was proper.

Ware also complains that defendants' failure to discuss the letter during deposition testimony under the guise of grand jury secrecy creates an issue of fact. Ware asserts the fact of nondisclosure in his counteraffidavit and defendants' depositions bear this out. During deposition questioning, on advice from counsel, defendants refused to answer certain questions pertaining to the authorship, composition and delivery of the grand jury letter. Defendants' counsel made timely objections to these questions and Ware "certified" these questions.

We are of the opinion that this issue should have been raised in the

trial court. (See *Hill v. Thomas B. Jeffery Co.* (1920), 292 Ill. 490, 127 N.E. 124.) Supreme Court Rule 211 (Ill. Rev. Stat. 1977, ch. 110A, par. 211(c)(4)) provides:

> "Any party may, but need not, on notice and motion obtain a ruling by the court on the objections *in advance of the trial.*" (Emphasis added.)

Moreover, Rule 219, concerning refusal to answer by a deponent, provides that the proponent of the question may move for an order compelling an answer. (Ill. Rev. Stat. 1977, ch. 110A, par. 219.) Additional discovery options available to Ware were the possibilities of a protective order regulating discovery to prevent an unreasonable disadvantage, or oppression by defendants (Ill. Rev. Stat. 1977, ch. 110A, par. 201(c)(1)); court supervision of discovery (Ill. Rev. Stat. 1977, ch. 110A, par. 201(c)(2)); or discovery sanctions where appropriate (Ill. Rev. Stat. 1977, ch. 110A, pars. 219(c), (d)).

■■ If Ware had attempted to implement these discovery safeguards, the issue of grand jury secrecy as a purported ground for refusal to answer deposition questions could have been litigated below. Our record, however, is silent on this issue. Since defendants have denied involvement with the grand jury letter via affidavits, we will not construe their deposition silence as inconsistent with these denials.

Construing all of the materials before the trial court in the light most favorable to the nonmoving party (*Century Display Manufacturing Corp. v. D. R. Wager Construction Co.* (1977), 46 Ill. App. 3d 643, 360 N.E.2d 1346), we find no triable issue of fact as to count X.

For all of the aforementioned reasons, the order of the circuit court of Cook County granting defendants summary judgment on counts I, III and X is affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.